UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10487-RWZ

HAROLD SAMPSON, JR.

v.

ARBOUR-FULLER HOSPITAL, ARBOUR HRI HOSPITAL
and UNIVERSAL HEALTH SERVICES

MEMORANDUM OF DECISION

November 2, 2012

ZOBEL, D.J.

Plaintiff Harold Sampson, Jr., brings this action against defendants Arbour-Fuller

Hospital ("Arbour-Fuller"), Arbour HRI Hopsital ("Arbour HRI"), and Universal Health

Services ("UHS") claiming violations of the Family and Medical Leave Act (FMLA), 29

U.S.C. § 2601, et seq., in connection with the termination of his employment.  Plaintiff

alleges both retaliation for taking protected leave (Count I) and interference with his

protected rights (Count II).  Defendants move for summary judgment (Docket # 12).

**I.  Background**

The record contains the following facts which, unless otherwise noted, are

undisputed.[1]

**A. The Parties**

---

[1] The facts are gleaned from the complaint ("Compl.") (Docket # 1), defendants' Local Rule 56.1
Statement of Material Facts ("Def. SOF") (Docket # 14) and accompanying documents (Docket ## 14-19,
with attachments), and plaintiff's Local Rule 56.1 Statement of Material Facts ("Pl. SOF") (Docket # 22)
and accompanying exhibits.

Arbour-Fuller is a licensed private psychiatric facility in South Attleboro, Massachusetts.  Arbour HRI is a licensed private psychiatric facility located in Brookline, Massachusetts.  Arbour HRI contracts with Arbour-Fuller to provide facilities management.  Both Arbour-Fuller and Arbour HRI are members of the Arbour Health System, of which UHS is the corporate parent.

Plaintiff was employed by Arbour-Fuller as the Facilities Manager for Arbour HRI from April 12, 2007 to August 9, 2010.  He was responsible for the overall operations and supervision of the maintenance and housekeeping departments at Arbour HRI, as well as managing and controlling the cost of outside vendors that were engaged to perform maintenance services.  He reported directly to James Rollins ("Rollins"), Arbour-Fuller's Chief Financial Officer.

**B.  Plaintiff's Work Performance**

While plaintiff asserts that he "performed the duties of a Facilities Manager in a satisfactory manner," Compl. ¶ 9, defendants paint a very different picture of plaintiff's job performance.

Throughout his tenure at Arbour-Fuller, plaintiff was the subject of numerous documented complaints from Arbour HRI employees and others who felt he was disrespectful and treated them rudely.  As a result of these complaints, Arbour-Fuller gave him both verbal and written warnings for unprofessional conduct, including a "Final Written Warning" on May 14, 2009.

As for plaintiff's work responsibilities, Rollins considered plaintiff a "marginal employee" with whom he "was constantly having discussions ... around performance-

related issues." Rollins Dep. 50-51, 85. On plaintiff's 2008 performance evaluation, conducted in May 2009, he received a rating of "1 - Requires Improvement" for 11 out of 25 specific categories. Notably, in the "Department Functions" section of the review, plaintiff was scored a "1 - Requires Improvement" on 6 of 8 specific job duties as Facilities Manager. Plaintiff's "Areas for Improvement" listed "[i]mprove inter-departmental communication and interactions[,] [b]etter assess jobs which can be performed inhouse[,] [a]dhere to financial guidelines[,] [c]omplete outstanding tasks in a timely fashion[,] [m]anage/supervise staff on a consistent basis[,] [e]nsure facility cleanliness." Sampson Dep. Ex. 4.

As a result of his poor performance review, plaintiff was issued a "Performance Improvement Plan" (PIP) on May 15, 2009. The PIP noted that "[plaintiff's] performance continues to deteriorate despite continued counseling by the CEO/CFO" and summarized his "deficiencies" into three main areas: "Staff management and oversight of duties, financial responsibilities, and professional conduct." Jenkins Decl. ¶ 9, Ex. G. The PIP also set forth a detailed plan for addressing problem areas and warned that "unless substantial improvement is made [during the next four weeks], termination may result." Id.

After being placed on the PIP, plaintiff's work performance improved to some degree. However, Rollins continued to need performance-related discussions with plaintiff. In late October 2009, for example, Rollins sent plaintiff an email observing that "HRI's cleanliness and state of repair clearly continues to trend downward" and identifying a number of problems that required immediate attention. Rolllins Decl. ¶ 5,

Ex. A.

### C.  Arbour-Fuller's Decision to Terminate Plaintiff

Rollins began contemplating either terminating plaintiff or eliminating his position sometime in February or March of 2010.  During February, March, and April, 2010, Rollins solicited input on the issue from various individuals in management: Patrick Moallemain, Chief Executive Officer of Arbour HRI; Charles Senior, Corporate Human Resources Manager for UHS; Bob Mansfield, Chief Executive Officer of Arbour-Fuller; and Lisa Pappone, Arbour HRI's Regional Risk Manager.

In March 2010, a fire at Arbour HRI forced the facility to close down for renovations.  In order to prepare Arbour HRI for reopening, plaintiff needed to ensure that a number of time-sensitive projects were completed and that the building was ready for approval from regulatory agencies.  However, during April and May, Rollins observed that plaintiff was "deficient" in completing projects in a timely manner, which jeopardized the schedule for reopening Arbour HRI.  Rollins Dep. 104-106.

Defendants claim that around that time, in the middle to latter part of May, Rollins decided to eliminate plaintiff's position.[2]  As a result of his discussions with other managers, Rollins felt it would be "easier to lay [plaintiff] off and give him the ability to collect [unemployment benefits], find another job" than it would be to terminate him.  Rollins Dep. 109-110.  Rollins decided that plaintiff's position at Arbour HRI would

---

[2] Plaintiff disputes that Rollins had the "sole authority to determine the elimination of a position as Defendants have a detailed Staff Reduction policy that requires a specific process and numerous other individuals['] input and concurrence in the case a manager desired to eliminate a position."  Pl. SOF at 1.  Plaintiff also disputes that a definitive decision of termination was made in May 2010, asserting that there is evidence to suggest that the final decision was not made until early August 2010. Pl. SOF at 3.  See infra Part III.C.1.

be eliminated and Matt Moulton ("Moulton"), the Facilities Manager at Arbour-Fuller, would handle maintenance responsibilities at both facilities.  The decision was based both on plaintiff's poor job performance, particularly during the renovations at Arbour HRI, and on financial reasons, since Arbour-Fuller would realize a savings in salary by eliminating plaintiff's position and consolidating his responsibilities under Moulton.[3] Rollins also believed that Moulton would save Arbour-Fuller money by better managing the cost of outside vendors, something plaintiff failed to do well.

In an email dated May 27, 2010, Rollins advised Arbour-Fuller's Human Resources Director, Brian Jenkins ("Jenkins"), that he (Rollins) had spoken with the CEO of Arbour HRI, Arbour-Fuller's Regional Vice President, and Arbour HRI's Regional Risk Manager "regarding the elimination of [plaintiff's] position" and that he believed "all are in agreement to move forward."  Rollins Decl. ¶ 6, Ex. B.  Rollins also suggested he and Jenkins meet the next day, May 28, to "go over final details" and make Moulton an offer.  Id.  Rollins stated that his intent was "to finalize these events in the next week or two" so that Arbour HRI could be "in a better position" for an upcoming visit from an accrediting agency.  Id.

On May 28, 2010, Rollins met with Moulton, who agreed to manage maintenance at both Arbour-Fuller and Arbour HRI facilities.  Before Rollins could execute the layoff, however, plaintiff submitted a request for FMLA leave.

### D.  Plaintiff's Health and FMLA Leave

---

[3] Plaintiff disputes that financial savings played any part in the decision to terminate him. Pl. SOF at 1-2.  See infra Part III.C.3.

Plaintiff suffers from Type II diabetes and has managed his condition for over ten years through diet, exercise, oral medications, and insulin.  He has also received treatment for diabetes and related conditions from various doctors, including his primary care physician Dr. Sowmya Viswanathan and endocrinologist Dr. Deborah Riester.

Plaintiff asserts that Arbour-Fuller was well aware of his health problems by the time Rollins and others began discussing his termination in 2010.  In April 2009, plaintiff submitted a note from Dr. Riester excusing him from work for several days "due to ongoing symptoms of vertigo."  Pl. Ex. 12.  On May 29, 2009, plaintiff emailed Rollins and Jenkins to tell them about his upcoming "quarterly diabetes appointment."  Pl. Ex. 1.  On Wednesday, September 30, 2009, plaintiff sent an email to Rollins regarding his need for time off for a medical appointment the following Monday.  Rollins responded asking "[w]hy is this just popping up now[?]," and told plaintiff to "keep [Rollins] in the loop better."  Pl. Ex. 2.  Plaintiff replied that he had just learned about the appointment himself, that he'd been "struggling with this inner ear infection for a few months now," and that he "will definitely have other appointments with the diabetes and its side affects but none are scheduled at this time."  Id.  Finally, on May 12, 2010, plaintiff filed an injury report after hurting himself during a workplace training exercise, stating that because of "spinning, twisting, [and] bending while training," he "got dizzy" and experienced pain in his neck and left ear.  Pl. Ex. 11.  As a result, plaintiff obtained a note from Dr. Viswanathan excusing him from work May 13 and 14.

On or about June 8, 2010, plaintiff contacted Dr. Viswanathan's office and

informed a nurse there that he was suffering from fatigue and dizziness so severe that he could not commute to work.  On June 8, 2010, plaintiff submitted a Request for Family Medical Leave form to the Arbour-Fuller Human Resources Department requesting two months off due to a serious health condition.  Prior to that day, plaintiff had not advised anyone at Arbour-Fuller that he needed FMLA leave.  Based on plaintiff's discussion with her nurse, Dr. Viswanathan provided a doctor's note dated June 17, 2010, explaining that plaintiff needed to be excused from work from June 9, 2010, to August 9, 2010.  On July 1, 2010, after seeing plaintiff for his annual physical, Dr. Viswanathan also submitted a medical certification form to Arbour-Fuller's third party administrator indicating a primary diagnosis of "diabetes - poorly controlled" and anticipating that plaintiff could return to work on August 9, 2010.  Pl. Ex. 5.  In her deposition, Dr. Viswanathan testified that she believed that plaintiff's fatigue and dizziness may have been related to his diabetes, and that plaintiff needed two months of leave so that he could be fully evaluated and, if necessary, receive specialized physical therapy for vertigo.

Rollins signed the authorization approving plaintiff's FMLA leave request in mid-June, a week or two after plaintiff began his leave.  This was the first time Rollins learned that plaintiff needed time off during the summer for medical leave.[4]  On or about June 30, 2010, Arbour-Fuller's Human Resources Department sent plaintiff a notice confirming that he was on leave of absence status effective June 9, 2010.

---

[4] Plaintiff disputes that Rollins did not know plaintiff would need medical leave prior to the summer of 2010 because Rollins was previously aware of his diabetic condition and prior requests for time off for medical appointments.  Pl. SOF at 3.  See infra Part III.C.1.

The record indicates that plaintiff did not receive physical therapy treatment while on leave.  On June 10, 2010, plaintiff had a routine follow-up appointment with Dr. Riester regarding his diabetes treatment.  Plaintiff also saw Dr. Viswanathan on July 1, 2010, for his annual physical and again on August 4, 2010, as a follow-up for his dizziness, fatigue, and insomnia.  At the latter appointment, Dr. Viswanathan cleared plaintiff for return to work full-time.

### E.  Plaintiff's Return from Leave and Termination

In July 2010, while plaintiff was out on leave, Patrick Moallemian, CEO of Arbour HRI and one of the managers consulted in the decision to lay off plaintiff, mentioned in an email to a Brookline Health Department employee that defendants "expect [plaintiff] to be back and fully recovered shortly."  Pl. Ex. 15.

On August 2, 2010, Jenkins, Arbour-Fuller's Human Resources Director, emailed Charles Senior, Corporate Human Resources Manager at UHS, stating that "the reduction in force we had conferenced with you a couple months back will be coming to fruition early next week" since plaintiff was due to return from his leave.  Pl. Ex. 14.  Jenkins wrote that he would inform plaintiff that his position had been eliminated and asked Senior whether he had any templates to use for the written notification of the position layoff.  That same day, August 2, plaintiff emailed Jenkins to confirm he would be returning to work on August 9.

On August 9, 2010, at the conclusion of his medical leave, plaintiff returned to work and met with Jenkins.  Jenkins informed plaintiff that his position as Facilities Manager at Arbour HRI had been eliminated and that, as a result, plaintiff was being

8

laid off.  Jenkins also told plaintiff that his past performance problems were a factor in the decision to lay him off.  Plaintiff was given a termination letter which explained that should the Facilities Manager position become available over the next six months, he would be subject to recall.

### F.  Arbour-Fuller's Decision to Hire a New Facilities Manager for Arbour HRI

Shortly after Moulton took over plaintiff's duties, Rollins emailed Patrick Moallemiam on August 14, 2010.  Rollins noted that Moulton, now acting as the Facilities Director for both Arbour-Fuller and Arbour HRI, had already made improvements at Arbour HRI within a very short time through his efforts and leadership.  Rollins also indicated that he planned to increase Moulton's compensation for his additional oversight and "to replace [plaintiff] with a 'lead' maint[enance] worker."  Pl. Ex. 23.  This, Rollins felt, would save the facility money "over the long run...by reducing the use of outside vendors while accomplishing more improvements."  Id.

On August 17, 2010, Jenkins sent an email update to Charles Senior, wherein he informed Senior that plaintiff's layoff was processed on August 9 and that plaintiff felt that the elimination of his position was retaliation for having taken FMLA leave. Jenkins also sought advice on how to "phrase a posting we are looking to put up around a lead maintenance person" who would report to Moulton.  Pl. Ex. 19.  Senior replied that he was not surprised that plaintiff was claiming retaliation, but was concerned that Jenkins was seeking "to create a new position when our conversation back in May of 2010 was that Matt Moulton was going to take over [plaintiff's] duties and at no time did we discuss adding a lead position at [Arbour HRI]."  Id.  Senior

9

warned that hiring a lead position "could come back and present a huge problem for the facility" and that had the idea been discussed in May, he "would not have recommended moving forward with this." Id.  Ultimately, Arbour-Fuller decided not to hire a lead maintenance employee at Arbour HRI and never posted a position for potential applicants.

However, keeping up with the work load at both Arbour-Fuller and Arbour HRI soon became too much for Moulton, and in November 2010, he informed Rollins that he no longer wished to handle facilities management at Arbour HRI.  Thus, Arbour-Fuller needed to reinstate and fill the Facilities Manager position at Arbour HRI.  Pursuant to Arbour-Fuller's Staff Reduction Policy, plaintiff would be subject to recall if management determined he could perform the job "in a manner satisfactorily [sic] to [Arbour-Fuller]...as evidenced by the employee's performance record."  Rollins Dep. Ex. 3.  Because of plaintiff's poor work performance in the past, Rollins concluded that plaintiff could not perform the job in a satisfactory manner and declined to recall him. Instead, in December 2010, Arbour-Fuller advertised for the Facilities Manager position at Arbour HRI and shortly thereafter hired a new employee to fill the position.

## II.  Legal Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A "genuine" issue of fact is one that must be decided at trial because the evidence "would permit a rational factfinder to resolve the issue in favor of either party."  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.

1990).  The court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.  O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  Even so, summary judgment may be appropriate "if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Medina-Munoz, 896 F.2d at 8.

## III.  Discussion

### A. Defendants Arbour HRI Hospital and Universal Health Services

As a preliminary matter, defendants contend that plaintiff's claims against Arbour HRI and UHS are misplaced since neither of those entities ever employed plaintiff. While plaintiff's work location was the Arbour HRI facility, he was hired and employed by Arbour-Fuller.  UHS is the corporate parent of both Arbour HRI and Arbour-Fuller, but each facility operates independently.  While various management personnel at Arbour HRI and UHS were consulted regarding the decision to eliminate plaintiff's position, Arbour-Fuller was ultimately responsible for plaintiff's employment and layoff. Because neither Arbour HRI nor UHS made the employment decisions at issue in the case, and plaintiff has offered no arguments to the contrary, all claims against Arbour HRI and UHS are dismissed.

### B.  FMLA Eligibility

Defendants[5] argue that plaintiff's claims must fail because plaintiff cannot show

---

[5] With the dismissal of all claims against Arbour HRI and UHS, Arbour-Fuller is the only remaining defendant in the case.  Nevertheless, I will continue to use the term "defendants" when referring to arguments made in the summary judgment motion, which was filed jointly by Arbour-Fuller, Arbour HRI, and UHS.

he suffered from a "serious health condition" and thus his two-month leave in the summer of 2010 was not protected by the FMLA.

The FMLA guarantees an eligible employee up to twelve weeks of leave per twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The Act defines "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

Plaintiff did not receive "inpatient care" during his leave, but whether he received "continuing treatment" for "a serious health condition" is in dispute. Under the Department of Labor's implementing regulations, a "serious health condition involving continuing treatment by a health care provider" includes incapacity and treatment, pregnancy or prenatal care, chronic conditions, permanent or long-term conditions, and conditions requiring multiple treatments. 29 C.F.R. § 825.115.

Defendants, citing the deposition testimony of Dr. Viswanathan, maintain that the medical reason for plaintiff's leave was vertigo, which could qualify as a "serious health condition involving continuing treatment" only on grounds of "incapacity and treatment." The criteria for "incapacity and treatment" require:

> (a) A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (1) Treatment two or more times, within 30 days of the first day of

12

incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

(3) The requirements in paragraphs (a)(1) and (2) of this section for a treatment by a health care provider means an in-person visit to a health care provider.  The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

29 C.F.R. § 825.115(a)(1)-(3).

Defendants argue that while plaintiff may have been incapacitated for more than three consecutive days for his vertigo, he never received the required "subsequent treatment" for that condition.  Plaintiff did not a see a health care provider for an in-person visit for his vertigo within seven days of his incapacity on June 9, 2010; his one medical appointment in that first week, on June 10, 2010, was a routine follow-up with Dr. Riester regarding his diabetes treatment, the records for which make no mention of dizziness or vertigo.  During the first thirty days of his incapacity, plaintiff had arguably only one "treatment" for his vertigo - his July 1, 2010, annual physical with Dr. Viswanathan.  Plaintiff did not receive physical therapy or any other type of medical treatment for his vertigo during his entire leave of absence.  Thus, defendants argue, plaintiff's vertigo was not "a serious medical condition involving continuing treatment by a health care provider" as defined in 29 C.F.R. § 825.115, and plaintiff was not entitled to FMLA leave.

Plaintiff takes a different tack.  He argues that the illness for which he requested

13

leave was not vertigo but diabetes, which qualifies as a "serious health condition involving continuing treatment by a health care provider" because it is a "chronic serious health condition."  29 C.F.R. § 825.115(c).[6]  Unlike "incapacity and treatment," there is no requirement in the regulations that an employee with a chronic serious health condition receive continuing supervision by a health care provider in order to qualify for FMLA benefits.  Plaintiff notes that the medical certification submitted by Dr. Viswanathan in connection with his leave request clearly indicates a primary diagnosis of "diabetes - poorly controlled."  Moreover, Dr. Viswanathan, in discussing why plaintiff required medical leave, testified that plaintiff's vertigo symptoms may have been linked to his diabetes.

A trier of fact could reasonably conclude that plaintiff took FMLA leave due to his diabetes, which is a "chronic serious health condition" eligible for benefits under the FMLA.  Since there is a genuine dispute about the nature of plaintiff's illness and whether his leave was protected under the FMLA, summary judgment in not appropriate

---

[6]  Under the regulations, a "serious health condition involving continuing treatment by a health care provider" includes:

(c) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition.  A chronic serious health condition is one which:

(1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

(2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, **diabetes**, epilepsy, etc.)

29 C.F.R. § 825.115(c) (bold added).

on this basis.

### C.  Retaliation Claim

Count I of the complaint alleges that defendants retaliated or discriminated against plaintiff for exercising his rights under the FMLA.

Where, as here, there is no direct evidence of retaliation, courts in this circuit analyze retaliation claims using a modified version of the McDonnell Douglas burden-shifting framework.  Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1980).  Under that framework, the employee bears the initial burden of demonstrating sufficient evidence to establish a prima facie case of retaliation.  Id. Once the employee makes such a showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory justification for the termination.  Id. at 160-61. If the employer articulates such a reason, the burden shifts back to the employee to demonstrate that the employer's stated reason was a mere pretext for retaliation.  Id. Defendants contend that plaintiff cannot establish a prima facie case of retaliation, and even if he could, he cannot show that Arbour-Fuller's articulated nondiscriminatory reasons are pretextual.

### 1.  Prima Facie Case

To demonstrate a prima facie claim for retaliation under the FMLA, plaintiff must show "that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activities and the employer's adverse employment action."  Id. at 161.  It is undisputed that plaintiff requested and received FMLA leave,

was laid off the day of his return, and was not recalled when his position became available four months later.  The parties disagree, however, on whether plaintiff has shown a causal connection between his leave and Arbour-Fuller's decision to lay him off.

Normally, "close temporal proximity" between the two events, while not dispositive, "may give rise to an inference of causal connection." Id. at 168.  But here, defendants argue that Arbour-Fuller's decision to eliminate plaintiff's position was made in May 2010, *before* plaintiff requested leave, and therefore could not have been motivated by retaliation.  See Pearson v. Mass. Bay Trans. Auth., No. 08-11733, 2012 U.S. Dist. LEXIS 31101 at *58 (Bowler, M.J.) (D. Mass. Feb. 3, 2012) ("[A]n adverse employment action that predates an employer's knowledge that an employee engaged in a protected activity cannot lead to an inference that the adverse action was motivated by retaliation.").  The record shows that plaintiff's supervisor Rollins had contemplated eliminating plaintiff's position for several months and had discussed the matter with other managers in February-May of 2010.  Rollins testified that he made the decision to lay off plaintiff in May 2010.  Emails from the end of May indicate that management was "in agreement to move forward in eliminating [plaintiff's] position," Rollins intended to "finalize these events within the next week or two," and Matt Moulton had agreed to assume plaintiff's responsibilities at Arbour HRI.  All these actions occurred at least a week before plaintiff submitted his leave request on June 8, 2010, and Rollins testified that he himself was unaware of plaintiff's need for medical leave until a week or two after it had already begun.

Plaintiff disputes that Rollins and Arbour-Fuller were unaware of his need for FMLA leave prior to deciding to eliminate his position.  Plaintiff admits that he had not informed Arbour-Fuller of his need for leave until submitting his request on June 8, 2010.  Nonetheless, he asserts that because Arbour-Fuller had notice of his past medical problems and was aware that he had already taken a couple days off in May 2010 for dizziness and pain in his ear and neck, Arbour-Fuller had "reason to believe" that plaintiff intended to exercise FMLA rights in the summer of 2010.  Essentially, plaintiff is claiming that Arbour-Fuller anticipated his need for future medical leave and took pre-emptive adverse action in beginning the process to lay him off.  But the record does not support such a conclusion, and I decline to find a causal connection on such speculative grounds.

Plaintiff fares better in raising a different timing question: regardless of when the process began, when was the decision to eliminate plaintiff's position finalized?  While defendants insist that the decision was complete in May 2010, plaintiff points to evidence that he believes suggests the decision was not finalized until August.  The CEO of Arbour HRI, Patrick Moallemian, commented in a July 2010 email to an outside party that defendants "expect [plaintiff] to be back and fully recovered shortly."  And in early August 2010, Brian Jenkins, Arbour-Fuller's Human Resources Director, consulted with Charles Senior, Corporate Human Resources Manager at UHS, on issues regarding the elimination of plaintiff's position.  Such evidence is not particularly compelling - and indeed, its significance is disputed by defendants - but when viewed in the light most favorable to plaintiff, it could support the conclusion that Arbour-Fuller

had not fully decided whether to lay off plaintiff in May 2010 and only did so later that summer after he had availed himself of FMLA benefits. <u>Cf.</u> <u>Zungoli v. UPS, Inc.</u>, No. 07-2194, 2009 WL 1085440 (D.N.J. Apr. 22, 2009) (finding <u>prima</u> <u>facie</u> case where employer contended it had decided to terminate plaintiff prior to his seeking leave, but emails indicated that another meeting was to be held before decision was finalized). The <u>prima</u> <u>facie</u> burden is "quite easy to meet," <u>Villanueva v. Wellesley College</u>, 930 F.2d 124. 127 (1st Cir. 1991), and under the plaintiff-friendly standards applied in summary judgment, plaintiff has sufficiently shown the causal connection necessary to move forward.

### 2.  Legitimate, Nondiscriminatory Reasons

Defendants have adequately articulated legitimate, nondiscriminatory reasons for laying off plaintiff.  They contend that the decision was based on both performance and financial reasons.  Defendants submitted ample evidence of plaintiff's poor work performance throughout his tenure at Arbour HRI, particularly his frequent clashes with other employees and inability to manage time-sensitive renovations in the spring of 2010.  Defendants also maintain, and proffer evidence to show, that Arbour-Fuller believed it would realize financial savings by eliminating plaintiff's position and having another employee manage the cost of outside vendors, something plaintiff did not do well.

Further, defendants offer a legitimate, nondiscriminatory reason for declining to "recall" plaintiff in December 2010.  Arbour-Fuller's Staff Reduction Policy provides that an employee who has been laid off is subject to recall should his/her position become

available within six months, but only if management determines the employee is "fully qualified and competent at the time to perform all aspects of the particular job in a manner satisfactorily [sic] to [Arbour-Fuller]...as evidenced by the employee's performance record."  According to defendants, Arbour-Fuller determined not to recall plaintiff based upon his history of unsatisfactory work performance, which is well documented in the record.

### 3.  Pretext

Plaintiff can meet his burden to demonstrate pretext "either indirectly by showing that employer's stated reasons for its adverse action were not credible, or directly by showing that the action was more likely motivated by a discriminatory reason." Hodgens, 144 F.3d at 168.

Apart from a general statement in his complaint that he "performed the duties of a Facilities Manager in a satisfactory manner," plaintiff does not challenge defendants' evidence of his poor work performance or problems with co-workers.  He notes, however, that since he was an employee-at-will, Arbour-Fuller could have decided to terminate him at any time if it truly concluded that his work performance was dissatisfactory.  Instead, plaintiff contends, Arbour-Fuller did not move to eliminate his position until around the time that he experienced medical complications and sought leave, suggesting the decision was driven not by his performance but by retaliation.  Cf., Moorer v. Baptist Memorial Health Care System, 398 F.3d 469, 490 (6th Cir. 2005) (in analyzing an FMLA interference claim, court held that where an employer was long aware of performance deficiencies, but did not terminate the employee until he took

medical leave, a fact finder could infer that the employee would not have been fired but for taking leave); Kohls v. Beverly Enterprises Wisconsin, Inc., 259 F.3d 799, 806 (7th Cir. 2001) ("We can imagine circumstances in which the timing of [a termination] decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the finding on the incidents of which the employer had already been aware).")

Importantly, plaintiff's dismissal was structured not as a termination for poor performance, but as a "reduction in force" ("RIF") wherein his position was eliminated. Plaintiff disputes the legitimacy of the RIF as well as defendants' articulated financial reasons for the layoff.

First, plaintiff casts suspicion on the timing of and need for the RIF. He points out that when Arbour-Fuller began considering the elimination of his position in May 2010, there had not been a decrease in the amount of maintenance work nor did defendants believe that the department was overstaffed. To the contrary, Arbour HRI was undergoing important renovations in preparation for reopening, and the maintenance department faced "a lot of tasks to be completed with specific definitive deadlines." Rollins Dep. 105. Plaintiff suggests it made little sense to initiate an RIF of the Facilities Manager during such a busy season, and thus the RIF was merely a ruse to disguise Arbour-Fuller's retaliation against him. Supporting this contention is evidence that Arbour-Fuller continued to seek ways to cover the duties contained in plaintiff's

supposedly "eliminated" position - first by considering hiring a lead maintenance worker to "replace" plaintiff immediately following his layoff, and then by reinstating the Facilities Manager position just four months later and hiring to fill it again.

Plaintiff also raises doubts that his layoff was truly intended to generate financial savings for Arbour-Fuller.  Arbour-Fuller did not claim a shortage of funds or seek to eliminate other positions in that time period.  Plaintiff contends that any assertion of financial motivation is contradicted by evidence showing that Arbour-Fuller, at the same time it implemented plaintiff's layoff, also planned to increase compensation to Moulton and hire a lead maintenance employee.[7]

From this evidence, a reasonable trier of fact could find that plaintiff's layoff was not actually due to the elimination of his position or a desire for financial savings, but was retaliation for taking FMLA leave.  While plaintiff's case is far from overwhelming, at this summary judgment stage, he has offered sufficient evidence to raise genuine issues of material fact as to whether the elimination of his position was a pretext for retaliation.  See Hodgens, 144 F.3d at 167 (when a nonmoving party rests on more than mere "conclusory allegations, improbable inferences, and unsupported speculation," trial courts "should 'use restraint in granting summary judgment' where discriminatory animus is at issue.") (citations omitted).

A final note on retaliation: although plaintiff has adequately shown a factual dispute regarding pretext with respect to the elimination of his position, he has failed to

---

[7] Plaintiff does not address defendants' claim that Arbour-Fuller would also save money because Matt Moulton would better manage the cost of outside vendors.

do the same regarding Arbour-Fuller's decision not to recall him when that position once again became available.  Indeed, plaintiff offers no rebuttal whatsoever to defendants' articulated nondiscriminatory reason, i.e., that in light of his past poor work performance, management determined that plaintiff could not perform the job in a satisfactory manner. Accordingly, defendants' motion for summary judgment is allowed on plaintiff's retaliation claim as it specifically pertains to Arbour-Fuller's recall decision.

### D.  Interference Claim

Count II of the complaint alleges that in choosing to "selectively terminate [plaintiff's] employment before he returned to work, [defendants] sought to prevent any future additional leave and deter others from accessing FMLA benefits."  Compl. ¶ 46. Plaintiff also alleges that defendants prevented him from returning to work after leave, thereby interfering with his exercise of FMLA rights.

Unlike with retaliation, "the employer's subjective intent is not relevant" in cases of interference, where "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA."  Hodgens, 144 F.3d at 159.  To succeed on an interference claim under the FMLA, an employee must show that he qualified for FMLA benefits, that he gave his employer appropriate notice, and that his employer denied him FMLA benefits.  Wheeler v. Pioneer Developmental Servs., Inc., 349 F. Supp. 2d 158, 164 (D. Mass. 2004).

Plaintiff's eligibility for FMLA benefits has already been addressed, see supra Part II.B., and the parties do not contest notice.  The sole question is whether plaintiff was denied any entitlement due him under the FMLA.  The record clearly shows that

plaintiff was granted medical leave as requested and that no one at Arbour-Fuller or

Arbour HRI interfered with his ability to take leave or pressured him to return to work

early.  Nor has plaintiff identified or offered evidence of any other individual who was

deterred from accessing FMLA benefits based on the fact that he was laid off.

But Arbour-Fuller's very decision to lay off plaintiff when he returned to work

could constitute interference since the FMLA provides employees the right "to be

reinstated in the same position or an alternate position with equivalent pay, benefits,

and working conditions" upon return from qualifying leave.  Hodgens, 144 F.3d at 159

(citing 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100(c)).  To be sure, the right to

reinstatement does not entitle the employee to "any right, benefit, or position of

employment other than any right, benefit, or position to which the employee would have

been entitled had the employee not taken leave."  29 U.S.C. § 2614(a)(3).  See also 29

C.F.R. 825.216 ("An employee has no greater right to reinstatement or to other benefits

and conditions of employment than if the employee had been continuously employed

during the FMLA leave period.").  In other words, an employer need not reinstate an

employee who would have been laid off or terminated even if he had not taken FMLA

leave.  See Pharakhone v. Nissan North America, Inc., 324 F.3d 405, 406 (6th Cir.

2003); Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1262 (10th Cir. 1998).

It is undisputed that plaintiff had numerous performance issues throughout his

tenure and that Arbour-Fuller began to consider eliminating his position prior to his

leave.  However, as discussed above with respect to retaliation, plaintiff has produced

sufficient evidence, particularly regarding the timing of Arbour-Fuller's decision, to raise

a question of material fact as to whether he would have lost his job had he not taken

FMLA leave.  Because plaintiff has established at least a <u>prima</u> <u>facie</u> case of

interference, summary judgment on Count II is denied.

**IV.  Conclusion**

Defendants' Motion for Summary Judgment (Docket # 12) is ALLOWED as to

both counts against Arbour HRI Hospital and Universal Health Services.  It is also

ALLOWED as to Count I against Arbour-Fuller Hospital with respect to the claim against

it arising out of its decision not to recall plaintiff.  The motion is DENIED as to all other

claims against Arbour-Fuller.

The court will hold a scheduling conference on Tuesday, December 4, 2012, at

2:00 p.m.


    November 2, 2012                            /s/Rya W. Zobel
          DATE                            RYA W. ZOBEL
                                     UNITED STATES DISTRICT JUDGE